UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO: 04-30033-04-MAP |
| v. | : | |
| | : | **Defendant's Sentencing Memorandum** |
| | : | **And** |
| JOHN SPANO | : | **Motion for Downward Departure** |
| | : | |
| | : | |

**Introduction**

John Spano appeared before Magistrate-Judge Neiman on August 30, 2006, and pleaded guilty to Count 2s charging a Racketeering Conspiracy in violation of Title 18 U.S.C §1962(d). The defendant pleaded pursuant to a global plea agreement that excluded only one defendant who went to trial and was acquitted. The government's position in the Plea agreement contemplates an Offense Level 16 (19 – 3 for acceptance of responsibility). The defendant is free to argue for a two-level reduction for minor role. The defendant also intends to seek a departure based on his medical condition and has agreed to execute releases and to provide documentation to the U.S. Attorney forthwith. The defendant has agreed to provide the government with any other departure argument at least twenty-one days prior to sentencing. The U.S. Attorney reserves its right to oppose any departure. To date, the defendant has supplied the government with documentation regarding the defendant's physical condition as well as the reasoning behind other departures.

It is now settled law pursuant to *United States v Booker,* 125 S.Ct. 738 (2005), that when imposing sentence the Court must consider the Sentencing Guidelines and Policy Statements. Under *Jiminez-Beltre,*440 F.3d 514 (1st Cir 2006) the Court is

1



required to begin the sentencing process by calculating the Guideline range, including resolution of any factual disputes and any departures. Then the Court may decide whether the "other factors" identified at 18: 3553(a) warrant a variance from the guideline range.

## Guideline Calculations

The initial disclosure of the Presentence Report arrives at an Offense Level 16, CHC I for a guideline range of 21-27 months. The defendant has objected and argued for a three-level reduction for his role. The defendant also requests a departure for his physical condition. Rather than repeat the arguments here, the defendant refers the Court to his objections to the Presentence Report.

Booker requires that in addition to considering the final advisory guideline calculation, the sentencing court is mandated to consider the statutory sentencing factors at 18 U.S.C. §3553(a) among which are (a)(1), the nature and circumstances of the offense and the history and characteristics of the defendant. As the circumstances of the offense and the defendant's personal history cannot be separated from each other, we shall deal with them together.

## Nature and Circumstances of the Offense

John Spano has pleaded guilty to one count of Racketeering Conspiracy. The offense charges the defendant and four co-defendants with conspiring and agreeing to a pattern of activity that involved Bribery. One of the four co-defendants was acquitted after trial. The defendant is not accountable for the other illegal acts mentioned in the Conspiracy count.

2

The defendant has owned and operated Valley Floor Covering in West Springfield since 1988. He learned the trade by helping his uncle and aunt in their business since he was 14 years old. When Spano started his own business, he began covering small residential flooring jobs. As his reputation and experience grew, in 1996 Spano began bidding on contract jobs, including contracts for Springfield Housing Authority. Spano never submitted a bid directly to SHA. His bids were always as subcontractor to the general contractors. The general contractors who took Spano's bids were G &R Construction and Manny's Plumbing & Heating. Spano was awarded a large contract from MPH to install vinyl tiling in 300 bathrooms in four SHA housing complexes. The partial payment of $30,000 proved to be a loss for Spano because he needed to redo 30 bathrooms at his own expense and Spano absorbed the additional cost of $9,000. The vinyl tiling laid down in the 30 bathrooms was done in the winter under pressure in order to meet a deadline. Because of cold temperature, the tiling did not stick and needed to be redone.

Spano was acutely aware that he was receiving indirect benefits from Ray Asselin, Sr. when he agreed to install carpeting at the Asselin family homes, including the Chatham house, the home of Joseph Asselin, Raymond Asselin, Jr., and a piece of carpet for the campaign headquarters of Christopher Asselin. Spano estimates the total value of the carpet installed to be $6,000. The defendant also installed carpet in the home of Fran Maroney. Although Spano submitted bills for his work, he was never paid and never pursued payment for fear of being cut off from future work of SHA.

As a result of his involvement in this offense, Spano is unable to bid on any federally funded jobs. His business is reduced to residential installations as in the early

days of his business. His income is significantly reduced and he can no longer employ the 26 union employees under a certified payroll. He now employs non-union sub-contractors to complete residential work.

The defendant has expressed his extreme remorse for engaging in this conspiracy and allowing himself to be involved in the corrupt machinations of the Asselin and Sotirion stronghold on the Springfield Housing Authority.

### Defendant's Personal Characteristics

The defendant is a 50-year old married father of one child. Spano is native to Springfield MA, attended the local schools and graduated from Springfield Technical High School. Since the age of 14, Spano has been involved in the floor covering business. He has always liked to work and spends long hours at this business, often installing carpet and flooring alongside his workers.

A family man, Spano married in 1998. Mrs. Spano had a previous relationship that produced a son who was five years old when she married Spano. The defendant was perfectly delighted to have a son and cares for him both financially and emotionally. The child's name was changed to Spano after the couple wed. The defendant's wife and child are the two most important people in his life. Needless to say, this offense has taken an emotional toll on the family.

Other problems plague the defendant in the form of his physical health. The most troubling problem is renal failure. Treatment for this condition began nearly ten years ago. His doctor, Franklin H. Epstein, is world renown and the Senior Physician, Renal Division, and William Applebaum Professor of Medicine, Harvard Medical School. He has written extensively on renal failure and the effect of other conditions on the kidneys.

Dr. Epstein has recently written to undersigned counsel about Spano's worsening condition. Among Dr. Epstein's findings:

> During the past ten years, his kidney function has declined from about 43% of normal in 1997 to about 29% of normal in April of this year.
> He is currently taking medication (**Diovan**) to control high blood pressure. Various treatments designed to prevent the progression of his disease have not worked in his case, and he is currently receiving intravenous treatments of an antibody against lymphoid cells (**Rituximab**), which has helped some patients with this problem.
>
> I believe that incarceration in prison would adversely affect his health and interfere with the medically indicated treatment for his kidney problem. In April 2006 his serum creatinine was 3.6 mg/100ml and his blood urea nitrogen 46 ml/100ml. The excretion of protein in his urine was 3.4 grams per gram of creatinine. (letter attached).

Spano's local doctor, Michael J. Germain, at Western New England Renal and Transplant Associates, wrote on October 23, 2006 to undersigned counsel:

> I am writing you concerning John Spano. John is a patient of mine with chronic kidney disease secondary to membranous nephropathy. John has multiple other medical problems. His kidney disease is advanced and has been resistant to treatment and he remains nephritic with advanced renal damage. He is close to the point of needing dialysis [regularly] and he requires multiple medications. John has advanced chronic kidney disease stage IV, and has been considered for renal transplant that may be necessary in the near future.
>
> He is on multiple medications and multiple medications have been tried to induce remission of his nephritic syndrome. We have tried Cytoxan, prednisone and recently he had a course of **Rituximab** intravenously for a month without improvement of his nephritic syndrome of proteinura. He is anemic treated with **Erythropoietin**, 10,00 units once a week, **ergocalciferol** 50,000, prednisone 20 mg a day, **Diovan** 160 a day, **Crestor** 10 mg a day and **Zetia** 10 mg a day for hyperlipidemia and **Prilosec** 20 mg a day for gastroesophageal reflux which is severe, **Ambien,** 10 mg a day for sleep. I should mention he had renal failure in August of last year and required dialysis treatment.(letter attached)

Spano sees a doctor for obstructive sleep apnea, David P. White, M.D. Senior Medical Consultant, Sleep Health Centers at Harvard Medical School, writes:

> I first saw him on October 12, 2005 and have followed him since that time, thus for approximately 1 year. He has severe obstructive sleep apnea with 86 apneas plus hypopneas per hour of sleep. This is currently being treated with nasal CPAP (continuous positive airway pressure). This a small machine that

5

pressurizes his upper airway and allows him to breathe at night. I also had him placed on a nasal spray called **Atrovent** to improve nasal potency to allow him to use the machine functionally at night. (letter attached)

It seems fairly clear from the doctors' assessments that the defendant will soon be required to undergo daily renal dialysis and a kidney transplant in the near future in order to survive. This dialysis procedure can only take place at what the BOP terms a Medical Referral Center. The kidney transplant, if required, would be at a private/specialized hospital and at a tremendous expense to the BOP. Moreover, the multiple medications the doctors have deemed necessary to Spano's treatment are not all on the BOP's 2006 Formulary. Three drugs-- ergocalciferol, Crestor, and Ambian-- are not found on the 2006 Formulary. Nor is it clear that Spano would be considered a candidate for a kidney transplant within the Bureau of Prisons system; or is it clear that Spano will be able to use the CPAP as it is not found on the formulary. The intravenous drug, Rituximab is only provided via a Medical Referral Center. It is quite clear from both Doctor Epstein's and Germain's letters that incarceration for Spano would probably worsen his condition. As Dr. Germain assesses: "I believe Mr. Spano, because of his severe medical problems, would require closer follow-up and more medical care than can be provided in the U.S Bureau of Prisons even in a hospital unit and I would be glad to discuss my care for the patient and his medical problems further." To be sure, the Bureau of Prisons will claim that it is possible to treat Mr. Spano's condition. That may be so, but Spano stands the best chance for survival by continuing treatment with his doctors who have been involved with his care for the past decade and are in the best position to provide the most appropriate care.

With reference to Commission's policy statement at §5H1.4 Physical Condition that "an extraordinary physical impairment may be a reason to depart downward; i.e., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment," the defendant notes that should the defendant be incarcerated, he would be sent to a Medical Referral Center; the closest such Center is FMC Devens. Spano's condition would be classified as Care Level 4, the highest level of care provided by the BOP. Examples of level 4 care are inmates who require dialysis. The formulary requirement for intravenous treatment of Rituximab is also restricted to Medical Referral Centers. Thus, even if Spano were not immediately placed on dialysis, in order for him to continue treatment with Rituximab, he would be sent to a Care Level 4 facility.

The cost to the government to incarcerate Spano and provide adequate medical care for Spano is excessive when counterbalanced by the benefit to society of not incarcerating him. Spano is not a dangerous person who requires incapacitation. His increasing illness is incapacitating on its own.

Moreover, Spano's incarceration at Care Level 4 facility is a higher security level than necessary for an inmate with Spano's offense and offender characteristics. Spano's incarceration and the care necessary to keep him in relative good health is out of proportion to the offense he has committed. The risk taken to his health by interrupting his present course of treatment is outweighed by the benefit to society of incarcerating this man.

The defendant and wife are very concerned for his health. Spano would like to be able to continue to work and contribute to the family but most especially to be present for his son's ensuing teenage years.

### Other Factors under 18:USC §3553(a)

The principle of parsimony as codified at 18 U.S.C. §3553(a) mandates this Court to fashion a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute at 18 U.S.C.§3553(a)(2) i.e., (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. (B) to afford adequate deterrence to criminal conduct. (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

The defendant believes that the community is well aware of the offenses against the Springfield Housing Authority committed by the Asselin and Sotirion stronghold. The public will be keenly interested in the punishment imposed on those two and whatever is the punishment it will serve to promote respect for the law and reflect the seriousness of the offense. The defendant is less culpable than his co-defendants charged in Count 2s. He is not accountable for any relevant conduct other than the overt acts charged in Count 2s. Some punishment is called for, but it need not include a period of confinement. As for deterrence, there is no question that Spano, on his own, could not have committed this crime or even conceived of the crime. He has lost his ability to contract with federally funded projects and is committed to never getting involved in such a matter again. The public does not need to be protected from John Spano. He

wishes to continue working on residential flooring which he has done most of his life. He has no need for vocational training. The medical care offered by the Bureau of Prisons cannot compete with the care he has been getting for the past ten years by experts in the field of renal failure. In view of the defendant's very minor role in this offense and his compromised physical condition, any jail sentence is greater than necessary to meet the purposes of sentencing.

## Conclusion

Whether the Court arrives at a guideline range that includes a departure for the defendant's role and his physical condition, or relies on the factors at §3553(a), explicated above, or a combination of both, defendant asks the Court to impose a non-jail sentence. He is sorry for his role in this offense and hopes that he will win back the respect of his wife and son.

ATTORNEY FOR THE DEFENDANT,

/s/ Thoms John Rooke
THOMAS JOHN ROOKE, ESQ.
73 Chestnut Street
Springfield, MA 01103
Ph: 413-731-9000
Fx: 413-731-1302
BBO# 549087

Dated: November 28, 2006

## Certificate of Service

I, Thomas John Rooke, Esq., hereby certify that on this day, I served a copy of the foregoing on the U.S. Attorney's Office via hand-delivery/facsimile/mailing, via first class mail, postage pre-paid, to 1550 Main Street, Suite 310, Springfield, MA 01103.

/s/ Thomas John Rooke
THOMAS JOHN ROOKE, ESQ.