**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR-N-04-30033-MAP |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| JOHN SPANO | ) |
| | ) |
| Defendant. | ) |

**GOVERNMENT'S RESPONSE TO DEFENDANT JOHN SPANO'S SENTENCING
MEMORANDUM AND MOTION FOR A DOWNWARD DEPARTURE**

The United States of America, by and through Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Steven H. Breslow, Assistant United States Attorney, hereby files this Response To Defendant John Spano's Sentencing Memorandum And Motion For A Downward Departure (Docket No. 355).

This motion, which seeks a downward departure or guidelines deviation based on the defendant's medical condition as well as the factors set forth in 18 U.S.C. § 3553(a), should be denied as baseless.

I.    Background

A.    The Defendant's Offense Conduct

As set forth in far greater detail in the Pre-Sentence Report dated November 2, 2006 and revised November 30, 2006 (the "PSR"), the defendant participated in a vast and damaging criminal enterprise centered around the corrupt operation of the Springfield

1

Housing Authority (the "SHA") by Raymond Asselin, Sr. and Arthur Sotirion, who served as SHA's Executive Director and Assistant Executive Director, respectively.

The defendant owned and operated a flooring business called Valley Floor Covering, Inc. ("Valley Floor"), which received over $1 million worth of SHA subcontracts from other corrupt contractors. PSR ¶ 34.

In particular, the defendant pleaded guilty to racketeering conspiracy (Count 2), in violation of 18 U.S.C. § 1962(d). In connection with the racketeering conspiracy, the defendant provided free carpeting at the homes of Asselin and Sotirion family members, all in exchange for the steering of lucrative SHA sub-contracts. PSR ¶¶ 90-102.

As part of this scheme, Spano carpeted the homes of Raymond and Janet Asselin, Christopher and Merylina Asselin, Melinda and Joseph Asselin, Lisa and Raymond Asselin, Jr., as well as the political office of Christopher Asselin, the Asselin family beach house in Cape Cod, and the home of Francis Maroney, the SHA purchasing agent. PSR ¶¶ 94-102.

In exchange, Sotirion ordered other corrupt contractors, such as Nicholas Katsounakis of Manny's Plumbing and Heating ("Manny's") and Gary Baribeau of G&R Associates ("G&R"), to steer highly valuable sub-contracts to Spano's company. As a result, Valley Flooring received approximately $100,000 from Manny's and more than

$200,000 from G&R.  PSR ¶¶ 90-92.  In addition, Spano received favorable treatment at SHA, in spite of poor and incomplete performance on his projects – all to the detriment of SHA's needy tenants and hard-working maintenance employees.  PSR ¶ 93.

As the defendant concedes, "I was keenly aware that Ray Asselin, Sr. and Arthur Sotirion ran the Housing Authority and could be very helpful in steering work my way. . . . I was well aware that I was receiving an indirect benefit from Raymond Asselin, Sr. as the executive director of the Springfield Housing Authority when I agreed to install carpet at the Asselin family homes."  PSR at pages 60-61.

B.  The Impact On Victims

Willing co-conspirators like the defendant enabled Asselin, Sr. and Sotirion to operate the SHA as a criminal enterprise, all with devastating consequences for the SHA, its administrators, its tenants, and the public.  As the SHA Board of Commissioners made clear in its Victim Impact Statement dated November 22, 2006 (the "Impact Statement"), "[m]any have been victimized and it will take a very long time to recover. . . . [t]he victim impacts have been severe."  Impact Statement, at 1, 7.  As the Impact Statement demonstrates, the loss figure attributed to any one defendant simply cannot capture the full extent of the harm caused by the defendants' crimes.  The defendants' crimes "have broken that essential trust with tenants, vendors, federal and state funding sources, and the

general public." Id. at 2.  Such damage to the public trust is, literally, incalculable.

As one concrete example of this intangible harm, SHA lost its classification as a high-performing agency, which in turn resulted in the loss of essential federal funds.  Id. at 3.  In order to regain this valuable status and bring the SHA back to even keel, SHA had to devote "[t]housands of hours of time."  The Board attests that "[i]t would take a forensic accountant to put a true dollar value on the effort," which cost an estimated "hundreds of thousands of dollars in time and talent."  Id. at 3.  Moreover, when SHA fails to obtain funding because of its criminal past, "the victims are the seniors and the disabled individuals who are the intended beneficiary" of the funds.  Id. at 4.

Further, as many of SHA's buildings are "nearing functional obsolesence," the greed of the defendant, who clad the Asselin family homes to curry favor and receive contracts, stands in stark relief.  Id. at 5.  In sum, as the SHA Board recognized, "the totality of the corruption is jaw-dropping." Id. at 6-7.

II.  The Probation Department Correctly Calculated
     The Defendant's Advisory Guideline Range

     A.   The Defendant Merits No Role Reduction

The defendant claims that he warrants a role reduction, contending mainly that he was less culpable than Asselin, Sr. and Sotirion, as well as another corrupt contractor, Paul Bannick.  PSR at pages 83-85.  This argument is meritless.

4

First, while Asselin, Sr. and Sotirion are more culpable, their greater roles are reflected by role enhancements.  In particular, the Probation Department has assessed Asselin, Sr. with a four-level role enhancement and Sotirion with a three-level role enhancement.[1]

Second, the defendant attempts to distinguish himself from another corrupt contractor, Paul Bannick, by arguing that Bannick gave cash (rather than materials and services, like the defendant), and that Bannick falsely reported his income to the IRS.  The form of a contractor's bribe is immaterial: because the free flooring that the defendant showered on the Asselin family had a definite dollar value, it was the functional equivalent of cash.  Similarly, Bannick's failure to report certain income on his taxes has no bearing on his role in the racketeering conspiracy - it is a completely separate offense.

   B.   The Government's Bribery Amount Is Correct

The defendant disputes the bribery amount, contending that it should be $7,450 rather than $24,315, and then mischaracterizes this amount as his restitution amount.  PSR at page 86.

First, the defendant agreed in his plea agreement that "the Defendant shall be jointly liable for restitution so that any proceeds recovered from all the other co-defendants who have agreed to the package plea agreement will offset any restitution ordered by

---

[1]  The government respectfully submits that Sotirion warrants a four-level enhancement.

the court." Plea Agreement, ¶ 4(c). Thus, the defendant is jointly and severally liable for the full amount of restitution: $6,226,313. PSR ¶ 341.

Second, the bribery amount is correctly calculated based upon the following references in the PSR at Paragraphs 90-102:

1.  $8,000 sought from Baribeau equals the cost of the Chatham carpet;

2.  $2,900 for Maroney's flooring carpet;

3.  $2,295 for Sotirion and Joe's carpet;

4.  $5,120 is the difference between the two invoices for the carpet area in Maroney's office; and

5.  $6,000 is a very low estimate of the fair market value for carpet in the houses of the remaining Asselin family members, based upon $1 per square foot. For example, the home of Ray Asselin, Sr. had wall-to-wall carpeting installed on both floors and the stairway leading to the second floor.

III. <u>The Defendant Does Not Merit A Downward Departure</u>

The defendant's request for a downward departure should be denied because the defendant has a relatively straightforward ailment that can be adequately treated by the BOP.

Section 5H1.4 of the United States Sentencing Guidelines provides in pertinent part:

> Physical condition . . . is not ordinarily
> relevant in determining whether a sentence

6

> should be outside the applicable guideline
> range.  However, an extraordinary physical
> impairment may be a reason to impose a
> sentence below a guideline range; e.g., in
> the case of a seriously infirm defendant,
> home detention may be as efficient as, and
> less costly than, imprisonment.

U.S.S.G. § 5H1.4.

A discouraged factor such as health, should only be considered where manifested "in unusual kind or degree." United States v. Rivera, 994 F.2d 942, 948 (1st Cir. 1993).  If a sentencing court finds that a defendant does not suffer from a form of "extraordinary physical impairment," the court may not then depart the defendant's sentence downward.  United States v. Hilton, 946 F.2d 955, 960 (1st Cir. 1991).

In interpreting Section 5H1.4, the First Circuit has indicated that a defendant's physical condition is not sufficiently extraordinary to warrant a departure if "the Bureau of Prisons could adequately accommodate [his] medical needs."  Id. at 960; see United States v. Studley, 907 F.2d 254, 258 (1st Cir. 1990)("[a] defendant's unique mental or emotional condition is only relevant if the [BOP] does not have adequate treatment services."); Hilton, 946 F.2d at 960 & n. 5 (no extraordinary physical impairment within the meaning of U.S.S.G. § 5H1.4 because the BOP could adequately accommodate the defendant's medical needs); United States v. LeBlanc, 24 F.3d 340, 348-49 (1st Cir. 1994) ("no evidence that the [BOP] would be unable

7

to adequately accommodate LeBlanc's medical needs"); <u>United States v. Lujan</u>, 324 F.3d 27, 31 (1st Cir. 2003) (same).

As the First Circuit explained, adequate treatment services are on "'a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards.'" <u>United States v. Derbes</u>, 369 F.3d 579, 583 (1st Cir. 2004) (quoting <u>United States v. DeCologero</u>, 821 F.2d 39, 43 (1st Cir. 1987)). Courts also examine whether a defendant's condition is such that a lengthy imprisonment would work "irreparable harm." <u>United States v. Maldonado-Montalvo</u>, 356 F.3d 65, 74 (1st Cir. 2003). In considering these factors, the First Circuit repeatedly has stressed its stringency in distinguishing between health problems that may be serious but that are not "extraordinary" and health problems that truly present an "extraordinary" case. <u>Derbes</u>, 369 F.3d at 583. Only the latter can justify a departure.

Here, because the defendant's medical condition is not extraordinary, the departure should be denied. Although he has received treatment over the years for his physical health, the defendant has not established that the Bureau of Prisons would be unable to accommodate his relatively common medical needs, or that the relatively short period of incarceration required by the Guidelines[2] would cause him to suffer irreparable harm. In fact, the evidence demonstrates the contrary.

_____

[2] The defendant's advisory guidelines range is 21-27 months.

8

First, the defendant's description of his own activities contrasts with his current claims of physical fragility. Although his health has deteriorated over the past ten years, he has also spent these years productively by operating his own highly active business. Thus, his physical ailments have not prevented – or even noticeably hindered – his vigorous work life.

Second, the BOP possesses the staff, programs, medications, equipment, facilities, and expertise to treat the defendant's health issues, kidney disease and sleep apnea. The defendant has not offered any medical conditions, in combination or otherwise, that the BOP cannot adequately treat.[3] In <u>United States v. DeCologero</u>, the First Circuit made clear that "though it is plain that an inmate deserves adequate medical care, he cannot insist that his institutional host provide him with the most sophisticated care that money can buy." 821 F.2d at 42. The court also noted that "poor health, in and of itself, should not automatically shield a convicted felon from his just deserts." <u>Id.</u> at 43; <u>See</u> <u>United States v. Anderson</u>, 260 F. Supp. 2d 310, 316 (D. Mass. 2003) (departure not warranted because diabetes and certain other serious health problems could be adequately treated in Bureau of Prison facilities and prison term

---

[3]    At the government's request, the BOP is examining the defendant's medical records in order to inform the court that it can provide him with adequate medical treatment. The Court has denied without prejudice the government's request (assented to by defnse counsel) to continue the sentencing until BOP responds.

necessary in recognition of seriousness of offense and need to send a message).

Third, the defendant is a relatively young man, aged only fifty, who suffers from relatively common ailments that simply are not extraordinary. As the Seventh Circuit observed:

> [M]any septuagenarians have conditions similar to [the defendant's]. Yet § 5H1.1 and § 5H1.4 put normal age-related features off limits as grounds for reduced sentences. Older criminals do not receive sentencing discounts. Many persons in poor health are confined in federal prisons.

United States v. Krilich, 257 F.3d 689, 693 (7th Cir. 2001); see also United States v. Seward, No. 97 CR 851, 2002 WL 31103488, at *3 (N.D. Ill. Sept. 19, 2002) (defendant must show that his condition is "extraordinary" to warrant a departure under §§ 5H1.1 and 5H1.4; proof of advanced age and medical problems, alone, are not enough).

Fourth, on the facts of this case, cost should not be deemed a dispositive factor justifying a downward departure. It will always be the case that home detention is cheaper than incarceration, and that less incarceration is cheaper than more. That is true for every single inmate in the BOP system, including those who do not receive medical services. More is required to justify a departure than simply the lower cost of home confinement. There must be something about the defendant, his age, and his infirmities that causes his situation to qualify as exceptional. Cf. United States v. Maldonado, 242 F.3d 1, 4 (1st Cir. 2001) (noting that in extraordinary cases, §§ 5H1.1 and 5H1.4 indicate that expense may be considered). The defendant has

failed to distinguish his health issues, which are relatively common and can be adequately treated by BOP.  The defendant's incarceration will cost no more than the incarceration of the many other inmates who receive the same or similar services.

Lastly, even in cases where defendants have established a more severe illness, the First Circuit has not found that a downward departure is warranted.  In fact, in United States v. Rivera-Maldonado, 194 F.3d 224 (1st Cir. 1999), the defendant was diagnosed as HIV-positive and had a dependent child with AIDS.  The First Circuit stated:

> Only an "extraordinary physical impairment" may justify a sentence other than imprisonment.  AIDS is not such a "physical impairment"; nor is cancer or various other terminal or life threatening conditions.  The Bureau of Prisons . . . has the medical personnel and facilities required to furnish defendant with the care and treatment he needs.  Indeed, defendant is entitled to that care and treatment. . . .  In sum, defendant's physical condition, while lamentable, is no basis for a departure.  Except in extraordinary circumstances not present here, terminally ill persons who commit serious crimes may not use their  affliction to escape prison.  Were this rule otherwise, the law's deterrent effect would be unreasonably and unnecessarily diminished in the case of terminally ill persons.

Id. at 236, n. 14 (quoting United States v. DePew, 751 F. Supp. 1195, 1199 (E.D. Va. 1990)); see Lujan, 324 F.3d at 33 (defendant's cirrhosis and calcified arteries did not warrant departure); LeBlanc, 24 F.3d at 348-49 (heart condition did not warrant departure); United

States v. Woodward, 277 F.3d 87, 90, 92 (1st Cir. 2002) (no departure for defendant with a large number of "severe and very life limiting" physical infirmities - including being paralyzed and confined to a wheelchair, having three blocked arteries in his heart and diabetes, taking 10-14 medications, and having been hospitalized many times).

Similarly, other courts have denied departures notwithstanding physical conditions that, from the descriptions, appear to have been materially more severe than the conditions presented by the defendant here. E.g., United States v. Johnson, 318 F.3d 821, 826-27 (8th Cir. 2003) (coronary heart disease and Hodgkins disease, and reversing departure); Krilich, 257 F.3d at 692 (69-year old defendant with pulmonary, cardiovascular, and peripheral vascular disease, and reversing departure); United States v. Persico, 164 F.3d 796, 801 (2d Cir. 1999) (triple bypass, kidney cancer, hypertension); United States v. Guajardo, 950 F.2d 203, 208 (5th Cir. 1991) (cancer, high blood pressure, amputee); United States v. Carey, 895 F.2d 318, 324 (7th Cir. 1990) (brain tumor); Seward, 2002 WL 31103488, at *3 (76-year old defendant with diabetes, hypertension and ulcers); United States v. Tolson, 760 F.Supp. 1322, 1331 (N.D. Ind. 1991) (pulmonary condition); DePew, 751 F.Supp. at 1199 (AIDS).

IV.  The Defendant Does Not Merit A Section 3553(a) Deviation

1.  Nature and Circumstances of the Offense

The nature and circumstances of the offense warrant a Guidelines sentence.  As set forth above, the defendant participated in a broad and corrosive racketeering conspiracy.  Given the

seriousness of the underlying offense, and the defendant's critical role as a briber, the nature and circumstances of the offense require a Guidelines sentence.  <u>See</u> 18 U.S.C. § 3553(a)(1).

    2.  <u>History and Characteristics of the Defendant</u>

Unlike many defendants who come before the Court to be sentenced, this defendant enjoyed a life of relative privilege and affluence.  He was "raised in an emotionally and financially secure environment."  PSR ¶ 301.  Both of his living brothers live close to the defendant in West Springfield and he has a supportive spouse. PSR ¶¶ 305-06, 309-10.  He graduated high school and continued to take college-level courses before starting a profitable career in the flooring business.  PSR ¶ 318.  He has owned and operated Valley Flooring since 1988.  PSR ¶ 319.

He purchased his home fourteen years ago, when he was approximately 36 years old.  PSR ¶ 308.  According to his tax returns, he earned substantial income for the years 2000-2005, including as much as $125,000 in 2003.  PSR at 321.  The defendant owns two automobiles, including a Mercedes Benz, and five valuable commercial properties.  The defendant's net worth exceeds $2.9 million.  PSR at 71-72.

Notably, the defendant concedes that after 1996, he had a broad client base that included the City of Springfield and the Housing Authorities in Holyoke, Chicopee, Westfield, and Framingham. Indeed, "I had more work than my business could endure and the

workload was affecting my family because of the stress of employing so many laborers and overseeing so many jobs." PSR ¶ 272. Thus, the defendant had no need - outside of pure greed - to bribe Asselin and Sotirion to obtain sub-contracts at SHA from other corrupt contractors.

Moreover, the defendant is in relative good mental health, and has no substantive abuse problems or other extenuating ailments that might have motivated him to commit his crimes.

Lastly, the defendant has a lengthy criminal history (resulting in no scoreable convictions), including nine separate arrests that were dismissed for unknown reasons. His most recent arrests occurred only six years ago, when he was 44 years old. PSR at 64-66.

In sum, the defendant's personal characteristics weigh in favor of, rather than against, a Guidelines sentence. First, as an educated person of relative affluence, the defendant well knew right from wrong and had absolutely no financial need to commit the crime. To the contrary, he has a net worth over nearly $3 million and was nearly overwhelmed with a volume of work from other clients during the time he engaged in the bribery. Thus, it appears that only his naked arrogance and greed motivated him to commit his crimes.

As a result, his personal circumstances aggravate, rather than mitigate, the seriousness of his crimes. At the very least, his history and characteristics warrant a Guidelines sentence. See 18

U.S.C. § 3553(a)(1).   In particular, the defendant's lack of
financial need to commit the crime merit, as well as his clear
ability to pay a fine, warrant the imposition a fine of $50,000,
which is the maximum fine in the defendant's guideline range.  PSR
¶ 335.

     3.   <u>The Need for the Sentence Imposed</u>

A Guidelines sentence is required "to reflect the seriousness
of the offense, to promote respect for the law, and to provide just
punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).

Here, the defendant participated in a serious offense that
ultimately harmed the SHA and its needy tenants, its contractors,
and its administrators, as well as the general public.  Although the
defendant insists he was simply a mere contractor, the unavoidable
fact is that corrupt contractors are essential components to bribery
schemes.   Without corrupt co-conspirators like the defendant,
Asselin, Sr. and Sotirion could not have succeeded in their crimes.
Only a Guidelines sentence will promote "respect for the law" and
"provide just punishment."  18 U.S.C. § 3553(a)(2)(A).  Moreover, a
Guidelines sentence would provide general deterrence for others
similarly situated in society.  <u>See</u> 18 U.S.C. § 3553(a)(2)(B).

V.   <u>Conclusion</u>

For the foregoing reasons, the Government respectfully asks
that the Court deny any downward departure or deviation from the
Advisory Guidelines Range and impose a sentence within the Advisory

Guidelines Range.  In addition, the government respectfully requests that the Court impose a fine of $50,000, which is the maximum fine in the defendant's guideline range.  PSR ¶ 335.

Filed this 6th day of December, 2006.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


    /s/ Steven H. Breslow
STEVEN H. BRESLOW
Assistant United States Attorney

CERTIFICATE OF SERVICE

Hampden, ss.                          Springfield, Massachusetts
                                      December 6, 2006


        I, Steven H. Breslow, Assistant U.S. Attorney, do hereby
certify that I have served a copy of the foregoing by electronically
filing said motion to:

Thomas John Rooke, Esq.
73 Chestnut Street
Springfield, MA 01103
Counsel for defendant John Spano


                              __/s/ Steven H. Breslow____
                              STEVEN H. BRESLOW
                              Assistant United States Attorney

17